## UNITED STATES DISTRICT COURT
### for the
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **CELESTA  SCOTT,** | ) | Civil Action File No. |
| individually and as | ) | **JURY TRIAL DEMANDED** |
| **ADMINISTRATOR OF** | ) | |
| **THE ESTATE OF** | ) | |
| **CHASTON PAUL TALLEY** | ) | |
| | ) | |
| Plaintiff(s) | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **GEORGIA DEPARTMENT** | ) | |
| **OF PUBLIC SAFETY,** | ) | |
| a State Agency of the State of | ) | |
| Georgia, **LT. CHARLES CHAPEAU,** in | ) | |
| his individual and official capacity, | ) | |
| **TFC DAVID KRAELING,** in his | ) | |
| individual and official capacity, **CITY** | ) | |
| **OF ATLANTA, GEORGIA,** a Municipal | ) | |
| Corporation of the State of Georgia, | ) | |
| **CHIEF DARIN SCHIERBAUM,** in his | ) | |
| individual and official capacity, **OFFICER** | ) | |
| **AUBREE HORTON, in his individual** | ) | |
| **and official capacity** | ) | |
| | ) | |
| Defendant(s) | ) | |

## COMPLAINT

**COMES NOW** Celesta Scott, by and through her undersigned counsel of record and hereby files this Complaint for Money Damages arising from Defendants' unlawful use of excessive force against Chaston Paul Talley, on June 4 2022, resulting in the death of Mr. Talley on August 6, 2022.

## INTRODUCTION

1.

Plaintiff brings this civil action seeking damages pursuant to 42 U.S.C. § 1983 for Defendants Violations of Plaintiffs' federal rights as guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution and for wrongful death and violations of Georgia law.

## PARTIES AND JURISDICTION

2.

Plaintiff Celesta Scott is the Administrator of the estate of her son, Chaston Paul Talley, deceased.

3.

Plaintiff resides in the Northern District of Georgia.

4.

Defendant Georgia Department of Public Safety (GDPS) is an agency of the State of Georgia and exercises police powers through the Georgia State Patrol. The Department can be served at 200 Piedmont Ave SE #1804 W Atlanta, Georgia 30334.

5.

At all times material hereto, Defendant Lt. Charles Chapeau was a law enforcement officer, a Lieutenant and a Supervisor of the Georgia Public Safety Crime Suppression Unit. Not only was Lt. Chapeau a policy maker, but he was also an active participant in GPSD Crime Suppression pursuits. He can be served at 959 United Avenue SE, Atlanta, Georgia 30316.

6.

At all times material hereto, Defendant TFC2 David Kraeling was a law enforcement officer employed by the GDPS and was acting under color of state law. He was a member of the GDPS Crime Interdiction Unit and assigned to the

2

GDPS Crime Suppression Unit. He can be served at 959 United Avenue SE, Atlanta, Georgia 30316.

7.

Defendant City of Atlanta ("the City") is a municipal corporation and political subdivision of the State of Georgia and exercises its police powers through the Atlanta Police Department (APD) . The City may be served with this Complaint by service upon Mayor Andre Dickens at 55 Trinity Avenue SW, Atlanta, Georgia, Georgia 30303.

8.

At all times material hereto, Darin Schierbaum was the Chief of Police for the City of Atlanta's Police Department and was acting in his capacity as final policymaker for the City with regard to its performance of police functions. He can be served at 226 Peachtree Street SW Atlanta, Georgia 30303.

9.

At all times material hereto, Defendant Aucee Horton was a law enforcement officer employed by the City of Atlanta Police Department.

10.

At all times material hereto, Defendant Officer Auree Horton was a police officer with the Atlanta Police Department acting under color of State and Municipal law. Horton is a member of the Atlanta Police Department's Auto Crimes Enforcement Unit and assigned to the GDPS Crime Suppression Unit. He can be served at 226 Peachtree Street SW Atlanta, Georgia 30303.

11.

Plaintiff provided timely notice of her claims to the City and State on or about May 30, 2023.

12.

Attached hereto as Exhibit "A" is the ante litem notices provided to the state and the city.

13.

3

Attached hereto as Exhibit "B" is proof of receipt by the City of Atlanta.

14.

The Defendants are citizens of the State of Georgia and at least one of them resides within the Northern District of Georgia.

15.

Upon service of the summons and complaint in a manner prescribed by law. Defendants shall be subject to the personal jurisdiction of the court.

16.

The subject incident occurred within the Northern District of Georgia Atlanta Division. Venue is therefore proper in this court.

17.

The Court has subject matter jurisdiction over this action.

## FACTUAL ALLEGATIONS

18.

On June 4, 2022, Plaintiff Chaston Paul Talley, while driving a dirt bike alone, through the streets of Atlanta, Georgia, Fulton County, Dekalb County, and the State of Georgia, was chased and hunted down by state and local law enforcement officials who were members of the Georgia Public Safety Department's Crime Suppression Unit. As Mr. Talley ran for his life, the chase lasted for more than 22 minutes.

19.

As a result of the pursuit, Mr. Talley was seized unlawfully, and brutally struck down in violation of the fourteenth amendment of the federal constitution and Georgia law. The Defendant Officer Lt. Charles Chapeau made at least one attempt to intentionally smash into Mr. Talley and the dirt bike he was driving, but missed. The attempt to strike Chaston Talley was performed with the deliberate intention to harm him and to do something wrong.

4

20.

The third attempt to seize and intentionally injure or kill Chaston Talley was conducted by Defendants David Kraeling of the Georgia State Patrol and Officer Aubree Horton of the Atlanta Police Department. Video provided by the Defendants clearly show Officer Kraeling intentionally steering his vehicle sharply to the left causing it to strike Chaston Talley and his dirt bike with such force that Mr. Talley was propelled into a tree along the roadway of Fairington Road in Dekalb County Georgia.

21.

Chaston Paul Talley died from major physical injuries to his body caused by the Defendants on August 6, 2022, at the Kennestone Hospital in Marietta, Georgia.

22.

The Defendants have experienced troublesome histories attempting to properly conduct law enforcement vehicle pursuits of alleged criminal suspects.

23.

The Georgia Department of Public Safety's troubling history of properly conducting such pursuits was aptly recognized during a May 10, 2018, meeting of the Georgia Board of Public Safety when the Commissioner of the Department of Public Safety, Mark W. McDonough, presented the 2017 Pursuit Summary Report.

24.

Commissioner McDonough reported that in 2017, 854 pursuits took place with 473 crashes. This means crashes occurred in 55% of the pursuits. He went on to report that 12 persons had lost their lives due to these pursuits, and he stated to the Board, "The pursuit business is a messy business and all in law enforcement knows this."

5

25.

He reported that most of the pursuits took place in Chatham, Dekalb, and Fulton Counties. These counties are all areas where Black citizens were the mayors of the largest cities and Black residents equaled at least 50% of the populations.

26.

Commissioner McDonough particularly singled out one State Trooper who was involved in most of these pursuits – Defendant Charles Chapeau. The number of pursuits participated in or supervised by Chapeau was so large that pursuits by the Georgia Department of Public Safety's Criminal Interdiction Unit were called "the Charles Chapeau category" According to McDonough, Chapeau was involved in 21 of 24 pursuits (88%). McDonough never stated Chapeau acted constitutionally in these pursuits but concluded despite his age, "(he) goes after those that need to be gotten."

27.

Commissioner McDonough during the meeting discussed the use of the obviously dangerous PIT maneuver which was the only procedure approved by the Department of Public Safety that allowed State Troopers to make physical contact with a fleeing suspect who drove a vehicle.

28.

McDonough at the end of his presentation regarding the PIT maneuver again stated to the Board, "I want to reiterate pursuing is a messy business, a difficult business."

29.

The Department of Public Safety put into place at least two Official Police Pursuit Policies prior to June 4, 2022. Both policies required specific training for State Patrol Officers attempting to utilize State pursuit policies. Both policies made clear that the pursuit of a motor vehicle (not to even mention motorcycles)

6

should only take place when the suspect has committed forcible felonies. Most importantly, both policies made it clear that a PIT Maneuver (intentional contact between police vehicles and suspect motorcycle driver) shall not be used to stop a pursuit with a motorcycle or All-Terrain Vehicle. The Department of Public safety after April 2021 then abruptly moved forward instituting a dangerous physical contact policy with motorcycles and ATVs, ignoring its own pursuit policies.

30.

The Defendants City of Atlanta and the Atlanta Police Department prior to June 4, 2022, experienced a number of problems with police chases. These pursuit issues culminated in the death of three bystanders killed in separate police vehicle pursuits in December of 2019. The Police Chief of Atlanta, Erica Shields, responded by suspending the Atlanta Police Chase policy. In a letter she wrote to the department she reasoned her decision for the no chase policy saying, "By chasing suspects, the police department is assuming an enormous amount of risk to the safety of officers and the public for each pursuit."

31.

Less than one year after the suspension of that chase policy, the new Police Chief, Rodney Bryant, revised the no chase policy instituting what he called, "a more restrictive policy." Under the new restrictive policy, Atlanta officers were not allowed to pursue vehicles based upon property crimes, instead officers were required to limit pursuits to forcible felonies. Additionally, police supervisors were required to give officers the green lights to initiate police chases.

32.

A few days after he was named interim Atlanta Police Chief in May of 2022, Chief Darin Schierbaum announced that the Mayor of the City of Atlanta agreed the pursuit policies for street racers should be more aggressive. The City of Atlanta and the Atlanta Police Department after April of 2021 deliberately and intentionally ignored their own police pursuit policies.

33.

7

In April of 2021, Georgia Governor, Brian Kemp, announced the formation of GDPS  Crime Suppression Unit. Governor Kemp was involved in a tightly contested political race to retain his seat as Governor and utilized the Suppression Unit as one of his major campaign platforms to combat crime and "street racing."

34.

The Governor's view was that local elected officials in the Atlanta Metropolitan Area were too lenient or soft on these street racers and the Suppression Unit was put together to wage a more aggressive approach to what was also described as a messy problem.

35.

During a debate with his 2022 gubernatorial election opponents the governor made this statement:

"I am glad to answer this question, I asked Colonel Wright to put together a suppression unit during Civil unrest. When I grew tired of local elected political leaders that wouldn't let their local law enforcement go after dangerous people during civil unrest. They had no chase policies where street racers and street gangs were terrorizing our citizens. I told Colonel Wright I wanted a plan. I wanted to know how much it would cost and who we would work with. I wanted to put together a plan to go after street racers."

36.

According to the National Institute of Justice (NIJ) from 1996 to 2015, police pursuits nationally resulted in more than 6,000 fatal crashes, leading to 7,000 deaths. That is an average of 355 fatalities a year and about one per day.

37.

Despite these alarming statistics, the governor continued to demand more aggression from the members of the State Patrol Crime Suppression Unit. On March 30, 2022, the Governor held a press conference with other government leaders and members of the Crime Suppression Unit. At the press conference the governor announced that the Unit had been involved in 572 pursuits. This is a

8

remarkable number when one considers that according to the Department of Public Safety in 2018, 852 State Troopers accounted for 854 pursuits statewide. The Criminal Suppression Unit was assigned less than 10 permanent members. If the Governor's figures were correct, this unit made over 67% of the total number of police pursuits by State Troopers in the State.

38.

Neither the Governor nor the Suppression Unit announced the number of injuries or deaths that were caused by these pursuits.

39.

On the weekend of June 3rd and June 4th of 2022, the Crime Suppression Unit assembled a Public Relations exhibit exclusively for WSB-TV, the largest television network in the State of Georgia. The purpose of the public relations exhibit was to demonstrate to viewers how the Defendants aggressive approach to the so called "street racers" worked.

40.

The staged event featured the Governor touting his new aggressive approach. He was joined by the Colonel Ricard Wright, the Commander of the Georgia State Patrol and the Defendant Darin Schierbaum, who stated the Mayor of Atlanta had given him his blessings to this new aggressive strategy, even though the new approach violated the fourteenth amendment rights of citizens and was directly inconsistent with the policies of his own police department.

41.

The Governor and his wife even boarded a helicopter to view the planned crackdown on street racers that would produce film or video footage for WSB-TV. Mark Winne, the WSB reporter, and his film crew were even allowed to ride along with the Suppression Unit , which directly contradicted claims that the police operation was dangerous for law enforcement officers. Unfortunately, for the deceased Chaston Talley, he was not aware he had unwittingly become the star of the television production.

9

42.

Prior to June 4, 2022, Chaston Talley and several of his friends observed a significant increase in the level of aggressiveness displayed by Georgia State Troopers against motorcycle and ATV riders. The troopers started to make contact with motorcycle and ATV drivers in a practice called "bumping." Talley and his friends felt the State Troopers were angry and would end up hurting or killing someone. The practices conducted by the Defendants constituted a deliberate and intentional use of deadly force against motorcycle and bike riders.

43.

Based upon the Metropolitan Atlanta Police pursuit policy and the Department of Public Safety police pursuit policies, the only area of aggressiveness not used against motorcycle and ATV drivers, before Governor Kemp assembled the Criminal Suppression Unit, was the use of force heretofore reserved for pursuits of automobiles. Law enforcement officers established a bright line prohibiting physical contact with motorcycle and ATV drivers. The call for more aggression was a deliberate and intentional call to cross this line.

44.

Based upon the Incident Report provided by Defendants, the pursuit of Chaston Paul Talley began at 23:00:05 on Moreland Avenue in Atlanta, Georgia. Four seconds later, the report indicates a pursuit was started by an unidentified Crime Suppression member. Mr. Talley was headed to his home located at 2148 Hasty Drive in Conyers, Georgia. He was driving a 2021 Blue Yamaha Dirt Bike. Based upon the Incident Report provided by the Defendants, he was not committing a crime at the time the pursuit began.

45.

During the 22-minute pursuit, the Defendants chased Mr. Talley through several Atlanta Streets and into Dekalb County. Shortly after the pursuit began, Lt. Charles a supervisor and police maker for Suppression Unit made a deliberate attempt to make contact with Chaston Talley by maneuvering the left portion of his

vehicle sharply into the right side of Mr. Talley and his small dirt bike. This use of force by the Defendants directed at Talley, if successful would have caused instant injury or death. The attempted striking of Mr. Talley was intentional, deliberate and conducted with malice. The blow was designed not to slow down or impede Mr. Talley, but rather to harm or kill him.

46.

TFC David Kraeling was participating with the Crime Suppression Unit on this occasion. He was regularly assigned as a K-9 Officer with Georgia State Patrol. The vehicle that he drove on June 4, 2022, was especially equipped to carry a dog and contained special equipment  for this purpose.

47.

After 18 minutes of the pursuit, Mr. Talley was in the appropriate right lane of traffic heading East down Fairington Road in Dekalb County, Georgia. The dash cam video provided by defendants shows that the vehicle driven by Kraeling pulled along the side of Talley on his left side. As Mr. Talley peacefully rode his dirt bike along the roadway,  defendant Officer Aubree Horton of the Atlanta, Police Department, who was riding with Kraeling and occupying the front passenger seat of the vehicle, clearly demonstrated the intention of the defendants to harm Mr. Talley when he asked his colleague Kraeling, "Do you want me to open the door and hit him?"

48.

Horton was aware that at the time he made this statement Talley presented no immediate harm to the officers. Horton knew that such a blow would critically injure or kill Mr. Talley. Atlanta Officer Horton knew the act was wrong, but felt such a deliberate use of force was approved by his City, his police department and the State Suppression Unit.

49.

Kraeling answered Horton and told him "no"  because Kraeling knew the pair could never provide any justification for striking Talley with a car passenger door.

11

50.

Defendant Kraeling then maneuvered his vehicle to the right towards Talley anticipating Talley would reduce his speed, drop behind Kraeling's car and emerge on the left side of the vehicle.

51.

The video provided by the defendants shows that as Talley pulled his dirt bike along the left side of Kraeling's vehicle, Kraeling made a deliberate ,intentional maneuver with his vehicle brutally smashing the left side of  the vehicle into the right side of Chaston Talley and his dirt bike. The force of the blow from the  4,575-pound  Dodge Charger against the 234-pound dirt bike lifted the bike from the roadway and propelled Talley and the bike into a large tree some 10 yards from the roadway. Chaston Talley struck the tree with such force that his body and bike rebounded into the highway where the Kraeling vehicle appears to run over Mr. Talley.

52.

The blow delivered by Kraeling was a seizure under the fourteenth amendment,  was deliberate and  performed with malice .The act of striking Mr. Talley was intentional and Kraeling knew at the time he was doing something wrong. At the time he struck Mr. Talley , Talley presented no immediate harm to Kraeling or Horton and Talley's  driving of the motorcycle presented no reason for to brutally kill Mr. Talley.

53.

The fact the contact between the vehicle of Kraeling and Mr. Talley was deliberate is amplified by the immediate actions made by  Kraeling to lie about the incident and attempt to cover up his actions. Even though the video clearly shows Kraeling sharply crashing into Talley , Kraeling immediately told his fellow officers that Talley had crashed into him.

12

54.

Lt. Charles Chapeau was present during the pursuit and was the supervising officer of the pursuit. Lt. Chapeau intentionally ignored the rules of the Department of Public Safety and participated in this unauthorized pursuit and utilized, approved and directed the use of the unreasonable force applied to Chaston Talley. Lt. Chapeau intentionally failed to properly train and supervise the Suppression Unit Officers to follow the rules of the Department of Public safety to utilize constitutional pursuits of dirt bikes and to not engage in the use of unreasonable deadly force.

55.

The defendants lead by Lt. Chapeau made an effort to conceal the injuries of Talley from the news media and the public, when the Suppression Unit would not reveal Talley's name to the ambulance service that transported Talley to the Atlanta Medical Center hospital to admit him into the hospital under the name Juniper Juniper.

56.

Because the defendants refused to reveal the name of Chaston Talley to Atlanta Medical Center, Mr. Talley's family members were not able to locate Talley for at least three days.

57.

The defendants filed a police report on June 5, 2022, containing the full name and contact information for Chaston Talley.

58.

The defendants made a deliberate effort to mislead the public by providing information to WSB reporter Mark Winne that Chaston Talley ran into a tree. The defendants also provided inaccurate information claiming the motorcycle was stolen and that Mr. Talley had a criminal record that the defendant members of the

13

Suppression Unit were aware of such information during the pursuit of Talley thus justifying the pursuit and the use of force.

59.

The most significant display of the Defendants' awareness of what they had deliberately done to harm Chaston Talley was wrong, is illustrated by the attempt of the defendants to mislead the Dekalb County Medical Examiners.

60.

The autopsy of Talley took place on August 8, 2022. In the first medical report, based upon information the Medical Examiner received from the Department of Public Safety, the medical examiner stated, "This 28-year-old black male was fleeing from law enforcement on his ATV when he lost control and crashed."

61.

The Medical Examiner conducted an additional investigation of the incident on November 17, 2023, and changed the autopsy report to read, "This 28-year-old black male was fleeing from law enforcement on a motorcycle when he and the Georgia State Patrol (GSP) MADE CONTACT. Mr. Talley lost control of the motorcycle and crashed.

62.

Mr. Chaston Paul Talley sustained multiple blunt force injuries involving his head, chest and extremities. Despite medical treatment, he succumbed to his injuries while still hospitalized on August 6, 2022.

## COUNT I

### The City of Atlanta is Liable for Officer Aubree Horton's Neglect to Perform or Improper Performance of Ministerial Duties

14

63.

Defendant City of Atlanta is liable to the Plaintiffs for Aubree Horton's neglect to perform or improper performance of ministerial duties.

64.

A municipal corporation may be liable for neglect to perform or improper performance of ministerial duties, O.C.G.A. § 36-33-1(b).

65.

A ministerial duty is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty.

66.

On June 4, 2022, Defendant Horton neglected to perform or improperly performed certain ministerial duties with respect to Chaston Paul Talley.

67.

Defendant Aubree Horton's ministerial violations are set forth below.

68.

Prior to June 4, 2022, City of Atlanta and Atlanta Police Department experienced increasing issues with police pursuits, culminating in the death of three bystanders from separate pursuits in December 2019.

69.

Erica Shields, Police Chief of Atlanta in 2019, suspended a policy barring police pursuits, acknowledging that those pursuits present an "enormous amount of risk to the safety of officers and the public for each pursuit.

70.

In 2020, Chief Rodney Bryant reformed and reinstated the Atlanta Police Chase policy, but only for forcible felonies and with supervisor approval before initiating the pursuit.

15

71.

In 2022, and in light of Governor Brian Kemp's crack-down on crime, interim Atlanta Police Chief Darin Schierbaum announced that the Mayor of the City of Atlanta agreed to make the policy for police pursuits more aggressive.

72.

The City of Atlanta, the Atlanta Police Department, and the Mayor of the City of Atlanta were aware of the dangers of aggressive police pursuit policies.

73.

O.C.G.A. § 40-6-6 states a police officer's actions during a pursuit may be the proximate cause of injury to a party when the officer acts with reckless disregard for proper procedures when initiating the pursuit.

74.

Defendant Horton acted with reckless disregard initiating pursuit of Mr. Talley.

75.

On June 4, 2022, Chaston Paul Talley was riding his dirt bike through Atlanta, Georgia, Fulton County, Dekalb County, and the State of Georgia, when police, including Defendant Horton, began chasing him.

76.

No officers on the scene reported any crime or offense before initiating the pursuit.

77.

Throughout the pursuit, Mr. Talley drove in a controlled and precise manner, adeptly navigating the road without causing any danger to officers or nearby drivers.

16

78.

About 22 minutes into the chase, Mr. Talley was riding along the passenger side of a police cruiser in which Defendant Horton was a passenger.

79.

Defendant Horton asked the driver, Officer David Kraeling, "*[insert exact line from the video- "Should I hit him with the door?"* to which Kraeling responded negatively.

80.

Mr. Talley then moved from the right side of a police cruiser to its left side, riding alongside the cruiser's driver side as both vehicles approached a guardrail in the median.

81.

As seen clearly in the video recording, the police cruiser then intentionally moved to its left and made contact with the dirt bike, crossing lines on the road, and continued pushing the dirt bike to its left into the median.

82.

The police cruiser pushed Talley directly into the guardrail, causing an abrupt collision. Talley's bike and body were launched backwards on impact.

83.

Talley's injuries were so severe and obviously debilitating that responding officers did not even bother verbally warning or detaining him as they stopped and approached him.

84.

A person in the employment of the City of Atlanta should have been aware of the dangers of pursuit to themselves, the public, and Mr. Talley.

17

85.

Before police initiated an unwarranted pursuit, Mr. Talley presented no danger to himself, officers, or the public.

86.

Throughout the pursuit, Mr. Talley presented no danger to himself, officers, or the public.

87.

The Defendant Horton intentionally violated his ministerial duty by engaging and continuing in pursuit of Talley where there was no danger present to officers or the public.

88.

The Defendant Horton intentionally violated his ministerial duty by engaging and continuing in pursuit of Talley where there was no reasonable suspicion of a crime.

89.

The City of Atlanta is liable for the acts of Defendant Horton in his capacity as an Atlanta Police Officer.

90.

Due to the negligence of Defendant Aubree Horton and the City of Atlanta, Mr. Talley suffered injuries, death, and resulting damages.

91.

Based on the actions described in this Count of the Complaint, Defendants City of Atlanta and Horton are liable for Chaston Paul Talley's injuries, death, special damages recoverable by Mr. Talley's estate, pre-death pain and suffering damages recoverable by Mr. Talley's Estate, and the full value of Mr. Talley's life (economic and intangible).

18

## The Georgia Department of Public Safety is Liable for Officer David Kraeling's Neglect to Perform or Improper Performance of Ministerial Duties

92.

Defendant Georgia Department of Public Safety is liable to the Plaintiffs for David Kraeling's neglect to perform or improper performance of ministerial duties.

93.

A municipal corporation may be liable for neglect to perform or improper performance of ministerial duties, O.C.G.A. § 36-33-1(b).

94.

A ministerial duty is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty.

95.

On June 4, 2022, Defendant Kraeling neglected to perform or improperly performed certain ministerial duties with respect to Chaston Paul Talley.

96.

Defendant Kraelings's ministerial violations are set forth below.

97.

Plaintiff reasserts and affirms the statements of paragraphs 6-12 and 16-27 of this complaint as written.

98.

O.C.G.A. § 40-6-6 states a police officer's actions during a pursuit may be the proximate cause of injury to a party when the officer acts with reckless disregard for proper procedures when initiating the pursuit.

99.

Defendant Kraeling acted with reckless disregard initiating pursuit of Mr. Talley.

19

100.

Chaston Paul Talley was riding his dirt bike through Atlanta, Georgia, Fulton County, Dekalb County, and the State of Georgia, when Georgia State Police, including Defendant Kraeling, began chasing him.

101.

No officers on the scene reported any crime or offense before initiating the pursuit.

102.

Throughout the pursuit, Mr. Talley drove in a controlled and precise manner, adeptly navigating the road without causing any danger to officers or nearby drivers.

103.

About 22 minutes into the chase, Mr. Talley was riding along the passenger side of a police cruiser in which Defendant Kraeling was the driver.

104.

Defendant Kraeling responded negatively to his passenger, Defendant Horton, when Horton asked if he should open his passenger door to hit and stop Mr. Talley driving alongside them.

105.

Mr. Talley then slowed down and moved from the right side of a police cruiser to its left side, riding alongside its driver's side as both vehicles approached a guardrail in the median.

106.

As seen clearly in the video recording, Kraeling then intentionally turned left and directly contacted the dirt bike, crossing lines on the road to do so, and continued pushing the dirt bike to the left and towards the median.

20

107.

The police cruiser then pushed Talley directly into the guardrail, causing an abrupt collision. Talley's bike and body were launched backwards on impact.

108.

Talley's injuries were so severe and obviously debilitating that responding officers did not even bother verbally warning or detaining him as they stopped and approached him on the ground.

109.

A person in the employment of the Georgia Department of Public Safety should have been aware of the dangers of pursuit to themselves, the public, and Mr. Talley.

110.

Before police initiated an unwarranted pursuit, Mr. Talley presented no danger to himself, officers, or the public.

111.

Throughout the pursuit, Mr. Talley presented no danger to himself, officers, or the public.

112.

The Defendant Kraeling intentionally violated his ministerial duty by engaging and continuing in pursuit of Mr. Talley where there was no danger present to officers or the public.

113.

Defendant Lt. Charles Chapeau was the supervising officer for the unlawful police pursuit of Mr. Talley.

114.

Plaintiff reasserts and affirms the statements in paragraph nine of this complaint.

115.

The Defendants Kraeling and Chapeau intentionally violated their ministerial duty by engaging and continuing in pursuit of Mr. Talley where there was no reasonable suspicion of a crime nor danger to any persons.

21

116.

The Georgia Department of Public Safety is liable for the acts of Defendant Kraeling in his capacity as an Georgia State Patrol Officer.

117.

Due to the negligence of Defendant Horton and the City of Atlanta, Mr. Talley suffered injuries, death, and resulting damages.

118.

Based on the actions described in this Count of the Complaint, Defendants City of Atlanta and Horton are liable for Chaston Paul Talley's injuries, death, special damages recoverable by Mr. Talley's estate, pre-death pain and suffering damages recoverable by Mr. Talley's Estate, and the full value of Mr. Talley's life (economic and intangible).

## COUNT III

## § 1983 and Fourth Amendment Claims against City of Atlanta and Georgia Department of Public Safety for Excessive Force and Cause or Contribution to the Death of Mr. Talley

119.

Defendants Kraeling, Chapeau, and Horton violated Mr. Talley's clearly established Fourth Amendment rights by using excessive force without actual or arguable reasonable suspicion or probable cause which every reasonable officer would have known would violate Mr. Talley's rights.

120.

A § 1983 claim for excessive force arises from the Fourth Amendment's protection "against unreasonable … seizures," Graham v. Connor, 490 U.S. 386, 394, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989). An officer's use of force is excessive under the Fourth Amendment if the use of force was "objectively [un]reasonable in light of the facts and circumstances confronting" the officer. Id. at 397.

22

121.

The Fourth Amendment's freedom from unreasonable seizures encompasses the right to be free from excessive force during an arrest, Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002) [Doc 20-1 at page 15].

122.

A "claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of [a] person" is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989); see also Scott v. Harris, 550 U.S. 372, 381 (2007).

123.

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559 (1979).

124.

When evaluating the constitutionality of an arresting officer's use of force, courts must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the government's interest in safely apprehending the suspect, Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (citation omitted).

125.

This is a necessarily fact-intensive inquiry that requires courts to consider (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight," Id. ("Graham v. Connor factors").

126.

Taking the above factors into account, the pursuing Atlanta Police Department and GSP officers' use of force against Mr. Talley was excessive.

127.

Every reasonable officer would have known that based on the totality of the circumstances confronting Defendants Kraeling, Chapeau, and Horton and at the time force was used, each of the Graham factors weighed against the use of any force and that the force used by Defendants was objectively unreasonable, grossly

23

disproportionate and gratuitous, and would violate Mr. Talley's Fourth Amendment rights.

128.

Mr. Talley posed no threat to the safety of officers or others.

129.

Here, the only alleged crime at issue was Mr. Talley's alleged refusal (hesitation) to comply with an unwarranted traffic stop.

130.

Under the first of the Graham v. Connor factors, such refusal (hesitation), standing alone, would not constitute a crime of sufficient severity to either authorize or warrant the use of any degree of force against Mr. Talley, including ramming his dirt bike with a police cruiser.

131.

As for the second Graham v. Connor factor, Mr. Talley did not pose an immediate threat to the safety of any person.

132.

As for the final Graham v. Connor factor, Deacon Hollman did evade by flight, but not to the extent which warranted force, let alone deadly force.

133.

Mr. Talley did not threaten nor aggressively drive toward any law enforcement officers or other persons.

134.

If Mr. Talley's refusal (hesitation) to stop for law enforcement officers could be considered resisting arrest, it is well established under the law that "resisting arrest without force does not connote a level of dangerousness that would justify a greater use of force," Fils v. City of Aventura, 647 F.3d 1272, 1288 (11th Cir. July 28, 2011).

135.

Mr. Talley applied no force to any law enforcement officer or other person, including in the form of active resistance or evading arrest.

136.

Defendant Kraeling, Chapeau, and Horton were not constitutionally justified in making contact with Mr. Talley's dirt bike to stop him, let alone in running Mr. Talley into a guardrail and causing his death.

137.

24

Defendants Kraeling, Chapeau, and Horton ended Mr. Talley's life over a potential traffic ticket.

138.

Constitutional law establishes that Defendants violated Mr. Talley's civil rights.

122.

During a police pursuit in Georgia, a law enforcement officer's action can only be proximate or contributory cause when he "acted with reckless disregard for proper law enforcement procedures in the officer's decision to initiate or continue the pursuit." O.C.G.A. § 40-6-6.

139.

Defendants Kraeling, Chapeau, and Horton did act with reckless disregard for proper law enforcement procedures.

140.

Defendants Kraeling, Chapeau, and Horton are not entitled to qualified immunity for their use of excessive force in violation of clearly established law.

141.

Under Georgia Department of Public Safety Manual, Section 17.02.2, officers "must use only the force that is reasonably necessary to bring an incident under control."

142.

Here, pushing the 27 year-old Mr. Talley's dirt bike into a guardrail and killing him was not necessary to bring the incident under control.

143.

Subsection 4.1.1 of APD.SOP.3010 provides that "[I]n all interactions, officers will strive to employ de-escalation techniques taught by the training academy to utilize the least amount of force necessary. They are expressly prohibited from the unnecessary or unreasonable use of force against any person or property."

144.

Here, pushing the 27 year-old Mr. Talley's dirt bike into a guardrail and killing him was an unnecessary and unreasonable use of force for the situation.

145.

The force Defendants Kraeling, Chapeau, and Horton employed against Mr. Talley Hollman for his perceived refusal pull-over, was plainly excessive, wholly

25

unnecessary, and indeed, grossly disproportionate under the Graham v. Connor factors.

146.

Mr. Talley made no violent or threatening gestures to any party throughout the incident.

147.

The force Defendants Kraeling, Chapeau, and Horton used against Mr. Tallet was constitutionally excessive and was a direct and proximate cause of Mr. Talley's death.

148.

As a direct and proximate result of Defendants' violations of clearly established law, Mr. Talley was killed, and Plaintiffs suffered damages.

## COUNT IV

### § 1983 Claims City of Atlanta and Georgia Department of Public Safety for Their Unconstitutional Unofficial Police Pursuit Policy

149.

At all relevant times herein, Defendant Schierbaum, as the Chief of Police, was the final policymaker for the City of Atlanta with final decision-making authority with regard to training, supervision, and discipline of officers employed by the City and the Atlanta Police Department ("APD"), establishing and implementing the written policies and procedures governing APD police officers (Standard Operating Procedures), and managing, directing, and controlling the operations, disciplinary process, and administration of The Office of Professional Standards ("OPS") and the Department as a whole.

150.

At all times material herein, Defendant Darin Schierbaum was the Chief of Police for the City of Atlanta. In June 2022 Mayor Andre Dickens appointed Darin Schierbaum to serve as Interim Chief of Police following the retirement of Chief Rodney Bryant. Schierbaum was appointed to be the 26th Chief of the Atlanta Police Department by Mayor Dickens in October 2022.

151.

26

At all material times herein, Defendant Chief Schierbaum had knowledge that APD officers throughout the department were routinely using unjustified force against citizens riding in cars and on motorcycles, and that these uses of force exceeded the city's official policy for enforcing traffic stops against drivers.

152.

The Department of Public Safety put into place at least two Official Police Pursuit Policies prior to June 4, 2022. Both policies made clear that the pursuit of a motor vehicle should only take place when the suspect has committed forcible felonies.

153.

Both policies made it clear that a PIT Maneuver shall not be used to stop a pursuit with a motorcycle or All-Terrain Vehicle.

154.

During his recent campaign, Governor Brian Kemp meant to specifically address "criminal street racing" activity with his special "Crime Suppression Unit", which is coordinated by multiple municipal and law enforcement bodies, including the Georgia Department of Public Safety and the Atlanta Police Department.

155.

Despite the aforementioned official policies forbidding contact with motorcycles or ATVs, Chief Schierbaum "agreed" that those policies should be more aggressive.

156.

The Georgia Department of Public Safety and Atlanta Police Department have abandoned official police-chase policies in favor of unconstitutional, unofficial, and far more aggressive policies.

157.

These new, unofficial, and unconstitutional policies include the initiation and continuation of police pursuits in cases of minor misdemeanors and the use of force such as PIT maneuvers against motorcyclists and ATV riders.

158.

Those unofficial and unconstitutional policies are upheld and enforced by both the Georgia Department of Public Safety and the Atlanta Police Department in their roles as coordinators and officers of the Crime Suppression Unit.

27

159.

Those unofficial and unconstitutional policies are directly in opposition to official police pursuit policies for the GSP and APD, which do not allow police pursuits except when for a forcible felony or where there is no danger to officers or other persons.

160.

Defendants City of Atlanta and Georgia Department of Public Safety widespread and persistent unconstitutional patterns and practices regarding the use of contact such as PIT maneuvers against motorcyclists instilled in Atlanta Police Officers the belief that they were permitted to use force against citizens with impunity and without any consequences.

161.

In connection with the subject incident, Defendant's officers were acting pursuant to the City's and State's unofficial policy of recklessly chasing misdemeanor offenders and using PIT maneuvers against motorcycle riders, which was the moving force behind their brazen use of those policies against Mr. Talley.

162.

As a direct and proximate result of the City's and State's unconstitutional conduct, Mr. Talley suffered injuries and death. Additionally, the Plaintiffs suffered damages for which Defendant City of Atlanta and Georgia Department of Public Safety are liable under § 1983.

## COUNT V

### Wrongful Death of Mr. Talley Against All Defendants

163.

As a direct, sole, and/or proximate cause of actions by Defendants, as described above, the Plaintiffs are entitled to recover any and all damages resulting from the wrongful death of Chaston Paul Talley, including but not limited to, the

28

full value of Mr. Talley's life, including economic damages, non-economic damages, and the loss of the enjoyment of living.

## COUNT VI

### Estate Claims of Mr. Talley Against All Defendants

164.

As a direct, sole, and/or proximate cause of actions by one or more of the Defendants and/or as described above, the estate of Deacon Johnny Hollman, of which Plaintiff Wilson is the administrator, is entitled to recover any and all damages resulting from Deacon Hollman's conscious pre-death pain and suffering, shock and fright, anxiety, funeral and burial expenses, and last expenses.

## COUNT VII

### Punitive Damages Against Individual Defendants

165.

Plaintiffs hereby incorporate and reallege each of the Paragraphs alleged above as if fully restated herein.

166.

The Individual Defendants' conduct as described herein evidences willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care which is sufficient to establish that the Individual Defendants acted with conscious indifference to the consequences of their actions.

167.

At all material times herein, the Individual Defendants acted with malice and/or reckless indifference to Deacon Hollman's federal rights.

29

168.

Plaintiffs are entitled to an award of punitive damages under state and federal law.

## COUNT VIII

### Attorney's Fees

169.

Plaintiffs hereby incorporate and reallege each of the Paragraphs alleged above as if fully restated herein.

170.

Plaintiffs are entitled to an award of attorney's fees under § 1988 and Georgia law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for the following:

a) A trial by jury;

b) A judgment in favor of the Plaintiffs for all damages recoverable under the law and as determined by the jury;

c) A judgment in favor of Chaston Paul Talley's estate for all damages recoverable under the law and as determined by the jury;

d) A judgment for the full value of Chaston Paul Talley's life;

e) For the recovery of attorney's fees and the expenses of litigation under §1988 and state law;

f) Punitive damages in an amount to be determined by the jury and as allowed by law;

g) For all costs to be cast against the Defendants;

h) For all such further and general relief which this Court deems just and proper.

Respectfully submitted, this day 4ᵗʰ day of June, 2024.

Paul L. Howard, Jr.
*Counsel for Plaintiffs*
Georgia Bar No. 371088

THE PAUL HOWARD LAW FIRM
920 Dannon View SW
Suite 3202
Atlanta, Georgia 30331
Telephone: (404) 855-6263
Email: paul@thepaulhowardlawfirm.com

31

EXHIBIT

A

tabbies

May 30, 2023

RE:              Ante Litem Notice

Deceased Party:    CHASTON PAUL TALLEY

Date of Injury:    JUNE 4, 2022

Date of Death      AUGUST 6, 2022

Location of incident: FAIRINGTON ROAD AND WILLOWICK DRIVE

DEKALB COUNTY , GEORGIA

Agency Case No.:    C000769038

Dear Sir/Madame:

Please be advised that I have been retained to represent MS. CELESTA SCOTT the mother of the deceased CHASTON PAUL TALLEY, a twenty-seven-year-old Black man who was negligently, maliciously and recklessly chased and dislodged from the motorized two- wheeled cycle or motorcycle he was driving as he headed towards his home, by a group of law enforcement officers who were employed by or represented agencies or departments from the State of Georgia , as well as local municipalities, county police  and sheriff department members. Based upon our investigation, this group of law enforcement officials were part of a loosely organized , temporary , ad hoc  "crime suppression unit " formed by Governor Brian Kemp and Director of Public Safety Colonel Chris Wright during the 2022 gubernatorial race. One of the stated purposes of the unit was  to aggressively circumvent "  local elected officials who had no chase policies (in their jurisdictions) and kept their officers from participating in the chase of motorcycles ". The so-called " crime suppression unit " was  negligently conceived, negligently planned , its members were negligently trained , negligently equipped , and negligently supervised. The State Agencies and Departments involved with this incident are the Governor's Office, the Department of Public Safety, the Georgia State Patrol, the Department of Natural Resources, and  the Georgia Bureau of Investigations. The State manned and State led  'crime suppression unit"  which is responsible for the death of CHASTON PAUL TALLEY,  negligently , maliciously, and recklessly violated both State law and federal law , negligently ignored the lack of official sanction from locally elected  officials within the jurisdictions the "crime suppression unit operated", negligently

ignored the "pursuit " policies of the Fulton County and Dekalb County Governments, and without legal or human cause or justification, negligently, maliciously and recklessly made the decision to physically and violently dislodge Mr. Talley from his two wheel vehicle causing his injuries, suffering and death. Most significantly, the State of Georgia negligently, maliciously and recklessly ignored its own rules and regulations found in the Georgia Department of Safety's Pursuit Policy 17.02. The actions of the State of Georgia are the direct cause of Mr. Talley's death.

Mr. Talley was negligently, maliciously, and recklessly injured on June 4, 2022, on Fairington Road and Willowick Road in Dekalb County Georgia. He was transported to Atlanta Medical Center, 303 Parkway Drive NE, Atlanta, Georgia 30312, where his condition worsened. He was later transferred to WellStar Kennestone Hospital, 677 Church Street, Marietta , Georgia 30060 , where he died on August 6, 2022.

The purpose of this letter is to comply with Ante Litem requirements pursuant to O.C.G.A. 50-21-26. We will be filing a lawsuit based upon the wrongful death of Mr. Talley citing the negligent conduct of the State of Georgia, its various agencies and departments involved with this incident and each of the State employees and representatives responsible for the death of CHASTON PAUL TALLEY. Today I am presenting the claim of Ms. Scott for general and special damages, both past and future, including but not limited to, pain and suffering and any other damages allowed under Federal or Georgia law. While our investigation is still on going, our claim at present is one hundred million dollars. If you contend this letter does not provide you with sufficient notice pursuant to O.C.G.A. § 50-21-26 , or comply with said statute , please advise me immediately in writing, and we will correct any deficiencies.

Sincerely,

Paul Howard, Jr.





SENDER: COMPLETE THIS SECTION
- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Honorable Colonel Chris Wright
Director of Georgia Dept of Public Safety
P.O. Box 1456
Atlanta, Georgia 30371

9590 9402 7643 2122 1270 50

2. Article Number (Transfer from service label)
7020 3150 0001 1847 9991

PS Form 3811, July 2020 PSN 7530-02-000-9053

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X _____ □ Agent
                  □ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from Item 1?  □ Yes
   If YES, enter delivery address below:       □ No

3. Service Type
□ Adult Signature
□ Adult Signature Restricted Delivery
□ Certified Mail®
□ Certified Mail Restricted Delivery
□ Collect on Delivery
□ Collect on Delivery Restricted Delivery
□ Insured Mail
□ Insured Mail Restricted Delivery
  ($500)

□ Priority Mail Express®
□ Registered Mail™
□ Registered Mail Restricted Delivery
□ Signature Confirmation™
□ Signature Confirmation Restricted Delivery

Domestic Return Receipt





**SENDER:** COMPLETE THIS SECTION

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Hon. Chris Carr
Atty General State of Georgia
40 Capitol Sq SW
Atlanta Ga 30334

9590 9402 7642 2102 4070 67

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X _____  ☐ Agent
                           ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
nature Confirmation™
nature Confirmation
tricted Delivery

EXHIBIT
B

Domestic Return Receipt



**SENDER:** COMPLETE THIS SECTION

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Hon. Chris Carr
Atty. General, State of Georgia
40 Capitol Sq SW
Atlanta, Ga 30334

9590 9402 7649 2199 1070 67

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

tabbies®

EXHIBIT

B

Domestic Return Receipt



SENDER: *COMPLETE THIS SECTION*

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Hon. Chris Carr
Atty. General State of Georgia
40 Capital SE SW
Atlanta Ga 30334

9590 9402 7649 2102 4070 67

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X _____ ☐ Agent
                   ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

EXHIBIT
B

Domestic Return Receipt



**SENDER:** *COMPLETE THIS SECTION*

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Hon. Chris Carr
Atty General State of Georgia
40 Capitol Sq SW
Atlanta Ga 30334

9590 9402 7643 9102 4970 07

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X _____  ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

tabbies

EXHIBIT
B

PS Form ... Domestic Return Receipt



**SENDER:** COMPLETE THIS SECTION

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Hon. Chris Carr
Atty General State of Georgia
40 Capitol Sq SW
Atlanta, Ga 30334

9590 9402 7643 0102 0102 87

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X _____ ☐ Agent  ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

EXHIBIT
B

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

tabbies®



SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Hon. Chris Carr
Atty. General State of Georgia
40 Capitol Sq SW
Atlanta Ga 30334

9590 9402 7643 2102 4070 67

2.

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X ☐ Agent
  ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

EXHIBIT
B

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS

Domestic Return Receipt

